**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

David Porter,                                    :        Case No. 1:14CV195

      Plaintiff,                             :

vs.                                              :

Commissioner of Social Security Administration,  :        **MEMORANDUM AND
ORDER**

      Defendant.                            :

                                                 :

In accordance with the provisions of 28 U.S.C. § 636 and Fed.R.Civ. P. 73,  the parties in this case consented to have the undersigned magistrate judge conduct any and all further proceedings, in the case, including the entry of  final judgment. .  Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, *et seq*. and § 405(g).  Pending are briefs on the merits filed by  both parties (Docket Nos. 15 & 17).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

## I.  PROCEDURAL BACKGROUND

On July 30, 2010, Plaintiff filed for SSI, alleging disability beginning August 1, 2002 (Docket No 12, pp. 143-146 of 494).  Plaintiff's claim was denied on October 18, 2010, and upon reconsideration on June 3, 2011 (Docket No. 12, pp. 66; 78 of 494).  Plaintiff filed a written request for a hearing on June 28, 2011 (Docket No. 12, p. 98 of 494).  On September 20, 2012, Administrative Law Judge (ALJ) C. Howard Prinsloo presided over the hearing by video conference in St. Louis, Missouri.  Plaintiff, represented by counsel Katherine Braun,

and Vocational Expert (VE) Kathleen Reis, appeared and testified by video in Cleveland, Ohio (Docket No. 12, p. 37 of 494).  The ALJ issued an unfavorable decision on September 28, 2012 (Docket No.12, pp. 12-31 of 494). The Appeals Council denied review of the ALJ's decision on January 13, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 4 of 494).

## II. FACTUAL BACKGROUND

### A. ADMINISTRATIVE HEARING

#### 1. PLAINTIFF'S TESTIMONY

Plaintiff testified that he was 44 years old, suffers from back pain and both auditory and visual hallucinations (Docket No. 12, pp. 40; 42; 45 of 494).  Plaintiff elaborated on his auditory and visual hallucinations explaining that he sees shadows that others do not see and that he tries to close doors when he sees the shadows because he does not want them to get him.  Plaintiff was unable to recall when he first started hearing the voices, but noted they make him uncomfortable and that he sees a psychologist (Docket No. 12, p. 43 of 494).

At the time of the hearing, Plaintiff indicated he was living with "Pops," and described a typical day watching cartoons on television, sleeping, eating, and sometimes changing his clothes (Docket No. 12, p. 44 of 494).  According to Plaintiff, he does not pay his own bills, but instead relies upon his sister (Docket No. 12, p. 45 of 494). When Plaintiff leaves the house, he noted that he walks around, but does not visit friends and does not get along with others because people treat him differently (Docket No. 12, p. 44 of 494).   Plaintiff takes Zyprexa for his hallucinations, which he indicated helps reduce the intensity of the voices, but that the medication has side effects including drowiness, dry mouth, thirst, and hunger (Docket No. 12, p. 43 of 494). To alleviate his back pain, which stems from a prior automobile accident, Plaintiff testified that he takes Tylenol (Docket No. 12, p. 45 of 494).

During the ALJ's examination, Plaintiff testified that he has heard voices for more than three years, but

2

could not recall the exact time period indicating that he was first treated in prison (Docket No. 12, pp. 46-47 of 494).   Plaintiff was last released from prison during the summer of 2010 (Docket No. 12, p. 46 of 494).  Over the last 15 years, Plaintiff gave testimony that he has been in and out of jail for most of that time, but he was unable to recall the total number of years he spent incarcerated (Docket No. 12, pp. 46-47 of 494).  Plaintiff was also unable to remember the medications he was administered while incarcerated or whether he has ever been hospitalized for problems hearing voices (Docket No. 12, pp. 47-49 of 494).  At the time of the hearing, Plaintiff indicated that he is still taking Zyprexa on a daily basis and that he receives treatment at MetroHealth from Dr. Marwaha (Docket No. 12, p. 49 of 494).

Since having been released from prison, Plaintiff has not maintained any employment (Docket No. 12, p. 45 of 494).  Prior to serving time in prison, Plaintiff worked as a landscaper, but was fired on his second day on the job (Docket No. 12, pp. 41; 48 of 494).  The ALJ observed that Plaintiff had also previously worked for Wind Construction moving equipment, but Plaintiff testified that "[t]hey'd take me with them because they didn't want to leave me in the house . . . [so] they took me with them" (Docket No. 12, p. 49 of 494).  When pressed for additional information about the work he performed, Plaintiff explained that he would move equipment for Wind Construction (Docket No. 12, p. 49 of 494).

## 2.   VE TESTIMONY

Noting that Plaintiff does not have any past work experience, ALJ Prinsloo started by asking the VE to consider a hypothetical:

> I want you to assume you're dealing with an individual who's the same age as the claimant, who's now 44, with the same GED education and the same lack of relevant past work experience. I'd like you to assume that the individual has the residual functional capacity for work at any exertional level, but is limited to simple, routine, and repetitive tasks.  Could you identify any jobs that exist in the local, regional or national economy for that hypothetical person?

(Docket No. 12, pp. 50-51 of 494).  After considering these limitations, the VE answered affirmatively that there

are jobs in the economy which such an individual could perform including, vehicle cleaner or car washer, DOT[1]

919.687-014, medium work, which is simple and unskilled with a specific vocational preparation (SVP)[2] of 1,

and having at least 100,000 jobs in the nation and 4,000 in Ohio; industrial cleaner, DOT 381.687-018, medium

work, which is simple and unskilled with a SVP of 2, and having at least 1.2 million jobs in the national

economy and 36,000 jobs in Ohio; kitchen helper, DOT 318.687-010, medium work, which is simple and

unskilled with a SVP of 2, and having at least 184,000 jobs in the nation and at least 7,200 jobs in Ohio (Docket

No. 12, p. 51 of 494).  ALJ Prinsloo followed up the VE's answer and asked:

> Now, if I were to add to this hypothetical that this individual could not perform tasks requiring
> more than superficial interaction with the public, would all those jobs remain?

(Docket No. 12, p. 51 of 494).  Once again, the VE responded affirmatively that all of the jobs she previously

listed would remain given the addition of a limitation for superficial interaction with the public (Docket No. 12,

p. 51 of 494).  When asked, the VE testified that her testimony is consistent with the DOT and supplemented

by her experience, training, education, certification, and consultation with her peers (Docket No. 12, pp. 51-52

of 494).         During examination by Plaintiff's attorney, the VE was asked whether her answers would change

if the individual would be off task at least 20 percent of the time (Docket No. 12, p. 52 of 494).  After

considering such a limitation, the VE indicated that a hypothetical worker would be unable to sustain

employment and that there would not be any jobs that the hypothetical person could perform (Docket No. 12,

p 52 of 494).

## B.    MEDICAL RECORDS

---

[1] Dictionary of Occupational Titles ("DOT")

[2] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

4

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

### 1. TREATMENT RECORDS - OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

- On November 19, 2009, Plaintiff denied a history of medical or psychiatric hospitalizations over the past five years, reported a history of Depression, dental issues, and chronic back pain stemming from a motor vehicle accident. The only medication he was taking at the time was Prozac[3] (Docket No. 12, pp. 187-188 of 494).

- On November 25, 2009, an Inmate Health Problem List notes Plaintiff's significant diagnoses as back pain, Depression, and elevated lipids (Docket No. 12, p. 186 of 494).

- On February 11, 2010, a health screening form lists back pain, Depression and elevated lipids among Plaintiff's diagnoses. The only medication listed for Plaintiff is Prozac 20 mg (Docket No. 12, pp. 185-186 of 494).

### 2. OFFICE TREATMENT RECORDS - CENTERS FOR FAMILIES AND CHILDREN

- On August 24, 2000, Plaintiff's records indicate a history of post traumatic stress disorder (PTSD) and Antisocial Personality Disorder, that Plaintiff was discharged from prison on July 3, 2000, and list his current medications as Prozac and Trazodone[4] (Docket No. 12, p. 191 of 494).

- On September 9, 2000, Plaintiff's condition was improved, he reported experiencing fewer nightmares and getting more sleep. Plaintiff was described as calm, smiling, with stable affect, and that he was not suicidal (Docket No. 12, p. 191 of 494).

- On October 5, 2000, Plaintiff's condition was about the same or slightly better. Plaintiff reported being depressed, experiencing intimidation and paranoia related thoughts concerning the police (Docket No. 12, p. 191 of 194).

- A handwritten Medication Administration Form reflects that Plaintiff was given Prozac and Trazodone, on four occasions beginning on August 24, 2000 through August 29, 2001. On May

---

[3] Prozac is prescribed to treat conditions including depression and panic attacks. *Prozac oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 11, 2014, 8:46 AM), http://www.webmd.com/drugs/drug-6997-prozac+oral.aspx?drugid=6997.

[4] Trazodone is prescribed to treat depression, improve mood, appetite, and energy levels and to decrease anxiety and insomnia related depression. *Trazodone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 11, 2014, 8:49 AM), http://www.webmd.com/drugs/mono-89-TRAZODONE+-+ORAL.aspx?drugid=11188&drugname=trazodone+oral&source=0.

8, 2002, Plaintiff was prescribed Geodon,[5] Paxil,[6] and Benadryl (Docket No. 12, p. 189 of 494).

- On August 29, 2001, the treatment record reflects Plaintiff had not been seen in approximately 10 months due to having been incarcerated from October through May 2001 for a probation violation. Plaintiff complained that he suffers nightmares related to his time spent in prison and experiences intimidating thoughts related to the police. Plaintiff indicated that he was living with a female friend and was described as stable and functioning well. He was diagnosed with PTSD and the dosages of his Prozac and Trazodone medications were increased (Docket No. 12, p. 190 of 494).

### 3.  INPATIENT HOSPITALIZATIONS

- On March 20, 2011, Plaintiff arrived by ambulance at the Emergency Room at Marymount North Hospital complaining that he was hearing a voice come out of the fish tank that instructed him to hurt somebody. Plaintiff had not taken his medications in a few days. On examination, Plaintiff was described as alert and under no acute physical distress, having normal mood, affect, and orientation. His physical examination noted no abnormalities. During his psychological examination, Plaintiff refused to elaborate about his homicidal thoughts and denied ingesting any substances. Mental health services were ordered (Docket No. 12, p. 228-234 of 494). Plaintiff underwent an EKG, which revealed normal sinus rhythm, nonspecific T wave abnormality and an abnormal ECG (Docket No. 12, pp. 238; 240-241 of 494). Plaintiff's laboratory blood work reported low levels of potassium and a low glomerular filtration rate in Plaintiff's blood while a drug screen revealed Plaintiff was positive for marijuana use (Docket No. 12, pp. 453-454 of 494).

- On March 25, 2011, Plaintiff presented himself to the emergency department at MetroHealth for evaluation after his sister reported his exhibiting bizarre behavior. The treatment notes reflect Plaintiff had not been compliant with his medications. On examination, Dr. Rhai Kapur, M.D., noted that Plaintiff had difficulty describing how he felt, but was internally stimulated, maintained poor eye contact, had flat affect, but was otherwise alert, oriented with speech and language intact, having tangential thought process, and poor judgment and insight. Plaintiff was diagnosed with Psychosis not otherwise specified, a history of Depression and PTSD. Plaintiff

---

[5] Geodon is a medication prescribed to treat mental and mood disorders including Schizophrenia and Bipolar Disorder. *Geodon oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 11, 2014, 8:54 AM), http://www.webmd.com/drugs/drug-20575-geodon+oral.aspx.

[6] Paxil is prescribed to treat conditions including depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and PTSD by helping to restore the balance of serotonin in the brain. *Paxil oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 11, 2014, 8:56 AM), http://www.webmd.com/drugs/mono-9095-PAROXETINE+-+ORAL.aspx?drugid=6968&drugname=paxil+oral&source=0.

was prescribed Zyprexa Zydis[7] and a psychiatric evaluation was ordered (Docket No. 12, pp. 285-292 of 494).  Plaintiff's laboratory results revealed low levels of platelet and high levels of mean platelet volume (MPV) in Plaintiff's blood (Docket No. 12, p. 363 of 494).  A toxicology test was negative for illicit drugs (Docket No. 12, p. 363 of 494).

4.   **OFFICE TREATMENT RECORDS - METROHEALTH SYSTEM**

- On May 4, 2011, Plaintiff was seen by Dr. Howard Hernandez, M.D. for medication management and reported his mood was average, and that he had been sleeping better.  Plaintiff expressed paranoid ideations and indicated that he hears voices.  At that time, Plaintiff noted living with his friend "Pops," denied recent illicit drug use, but indicated having last used nine months earlier.  Plaintiff was diagnosed with Psychosis not otherwise specified, Borderline Identity Disturbance, and his dosage of Zyprexa was increased (Docket No. 12, pp. 268-270 of 494).

- On June 7, 2011, Plaintiff followed-up with Dr. Hernandez for medication management and reported that his mood was okay and denied suicidal ideations.  Plaintiff indicated that he watches television all day, that the voices have slowed down as much as 25%, but that he still hears a man's voice instructing him to get out and go to the park.  Plaintiff was compliant with his medications, his toxicology results were negative, his diagnosis noted Schizophrenia not otherwise specified, and that his dosage of Zyprexa was increased (Docket No. 12, pp. 408-410 of 494).

- On November 2, 2011, Plaintiff was seen for medication management by Dr. Vincent Izediuno, M.D. and reported feeling the same as before but was unable to explain those feelings.  Plaintiff reported paranoia, denied homicidal and suicidal thoughts, and indicated that his medications were helping.  Plaintiff's diagnosis was listed as Schizophrenia paranoid type, and his Zyprexa medication was increased to 20 mg at bed time (Docket No. 12, pp. 413-414 of 494).

- On February 27, 2012, Plaintiff presented himself for medication management to Dr. Priyanka Deshmukh, M.D. who described Plaintiff as very paranoid during the visit.  Plaintiff was surprised to see a new doctor and requested the door remain open during the interview.  Plaintiff reported doing okay, but indicated he ran out of his medications and last took his Zyprexa the week before.  He indicated experiencing visual and auditory hallucinations, but that "[w]hen i take that medicine all this goes down."  Plaintiff also expressed paranoid ideations, was guarded, and denied suicidal or homicidal ideations.  Plaintiff's diagnosis and medications were maintained (Docket No. 12, pp. 418-420 of 494).

5.   **OFFICE TREATMENT RECORDS - DR. RAMAN MARWAHA, M.D.**

---

[7] Zydis Zyprexa or Zyprexa, as it is commonly referred to, is prescribed to treat mental and mood conditions such as Schizophrenia, Bipolar disorder, and may be prescribed in combination with other medications to treat depression. *Zyprexa Zydis oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Aug. 11, 2014, 9:31 AM), http://www.webmd.com/drugs/drug-19876-zyprexa+zydis+oral.aspx?drugid=19876&drugname=zyprexa+zydis+oral.

- On April 11, 2012, Plaintiff was given a mental health assessment as part of his initial evaluation with Dr. Marwaha, but was described as being difficult to interview, suspicious, and uncooperative with questioning.  Plaintiff reported living with friends, that his mood was okay and denied experiencing symptoms of mania, depression or having homicidal or suicidal ideations.  After denying any hallucinations, Plaintiff described hearing voices and seeing a man. He also denied any recent illicit drug or alcohol use.  Plaintiff's diagnosis and medications were maintained, blood tests ordered, and he was assessed a global assessment of functioning (GAF)[8] score of 45 (Docket No. 12, pp. 426-430 of 494).

- On May 24, 2012, Plaintiff had a follow-up for medication management and requested the door of the exam room remain open.  Plaintiff reported having a problem with his living situation and that his mother and sister will be unable to pay for his apartment soon, but explained that if he gets disability he will be able to go to another apartment.  He indicated experiencing paranoid ideations, auditory hallucinations, but denied suicidal or homicidal ideations and noted that he is compliant with taking his Zyprexa medications.  Plaintiff's diagnosis and medication were maintained (Docket No. 12, pp. 472-473 of 494).

- On July 25, 2012, Plaintiff presented himself for a follow-up for medication management and again requested the door to the exam room remain open.  Plaintiff reported his mood was fine and denied any suicidal or homicidal ideations.  Plaintiff also reported hearing auditory hallucinations but that "they are not what they used to be," and "had not been telling [him] to do anything for a long time now."  Plaintiff denied visual hallucinations for weeks, expressed paranoid ideations, indicated that he was compliant with his medications, and that the medicine was helping. Plaintiff was described being stable and at baseline on his Zyprexa medication (Docket No. 12, pp. 479-480 of 494).

## C.    MENTAL HEALTH ASSESSMENTS & MEDICAL SOURCE STATEMENTS

### 1.    ADULT DIAGNOSTIC ASSESSMENTS

#### a.    PSYCHIATRIC EVALUATION - CENTER FOR FAMILIES AND CHILDREN - DR. SEONG SHIM, M.D.

On August 24, 2000, Plaintiff underwent a psychiatric evaluation and complained of persistent depressed mood, anxiety, frequent nightmares, intrusive thoughts, intermittent flashbacks, difficulties concentrating, poor appetite, sleep disturbances, low self-esteem, paranoia and fear, following his release from prison.  Plaintiff also complained of symptoms of depersonalization.  His history of present illness included polysubstance abuse,

---

[8]  The Global Assessment of Functioning scale is "[a] procedure for measuring overall severity of psychiatric disturbance." *DSM-III-R-Axis V: Global Assessment of Functioning Scale (GAF)*, UNIV. OF VA., (August 6, 2014, 12:08 PM), http://macarthur.virginia.edu/Data/Pdf/gaf.pdf.

antisocial behaviors, and PTSD.  As the result of a disciplinary charge, Plaintiff reported that while incarcerated,

he had been held alone in a small cell for all but one hour of outside exercise.  At some point, Plaintiff indicated

that he was transferred to a high security prison in Maryland where he remained until discharged to a friend's

house in Ohio where he had been under house arrest.  Dr. Shim diagnosed Plaintiff with PTSD, polysubstance

abuse, which is in sustained remission in a controlled environment, alcohol abuse, and antisocial personality

disorder.  Plaintiff was assessed a GAF score of below 30.  Plaintiff was started on Prozac and Trazodone and

the record indicates Plaintiff needed case management and more comprehensive care (Docket No. 12, p. 192 of

494).

    **2.**    **CRISIS ASSESSMENTS**

        **a.**    **MENTAL HEALTH SERVICES FOR HOMELESS PERSONS, INC.**

- On March 21, 2011, Plaintiff was assessed by a professional counselor[9] with the mobile crisis unit in the emergency room at MetroHealth System after Plaintiff reported hearing voices from fish instructing him to hurt someone.  During the interview, Plaintiff was unable to recall any details concerning his medications, history of treatment and prior hospitalizations, who he was living with and their relationship to him.  On examination, Plaintiff was described as oriented, but that he failed to make eye contact, had restricted speech, was logical and rational but would suddenly stop responding to questions and become mute when confronted about the vagueness of his claims (Docket No. 12, p. 248 of 494).  It was opined that Plaintiff was using the emergency department for secondary gain and his diagnosis included malingering, Substance Abuse not otherwise specified with a note to rule out Adjustment Disorder.  Secondary diagnoses of Anti-Social Personality Disorder, and Depression were noted, and Plaintiff was assessed a GAF of 52 (Docket No. 12, p. 252 of 494).

- On March 25, 2011, Plaintiff underwent a crisis assessment with a licensed social worker[10] at MetroHealth System.  On examination Plaintiff was oriented to place, date, and time, but mistaken concerning the day of the week.  He had restricted speech, which was otherwise logical and rational with no impairment in his quality of thought or speech (Docket No. 12, p. 243 of

---

[9]  The undersigned Magistrate is unable to decipher the name associated with the signature of the credentialed service provider but observes that the name is followed by the acronym PC for Professional Counselor (Docket No. 12, p. 247 of 494).

[10]  The undersigned Magistrate is unable to determine the name associated with the signature of the credentialed service provider but observes that the name is followed by the acronym LSW for licensed social worker (Docket No. 12, p. 247 of 494).

494).  Plaintiff was diagnosed with Mood Disorder not otherwise specified with a notation to rule out Sub-Induced Mood Disorder.  An accompanying narrative notes that it was difficult to ascertain Plaintiff's actual state prior to being medicated and restrained in the emergency room (Docket No. 12, p. 247 of 494).

3.    MENTAL HEALTH ASSESSMENTS

   a.    METROHEALTH SYSTEMS - DR. SMILA KODALL, M.D.

On March 25, 2011, Plaintiff underwent a mental health assessment after complaining that he was hearing voices and being observed by family members exhibiting unusual behavior.  Plaintiff reported actively using alcohol and occasional illicit drugs including marijuana and crack the week before.  Dr. Kodall diagnosed Plaintiff with Depressive Disorder not otherwise specified, includes a reference to" PTSD rule out psychosis not otherwise specified," and assessed Plaintiff a GAF of between 21-30 (Docket No. 12, pp. 357-359 of 494).

   b.    METROHEALTH SYSTEMS - PAMELA A. BUDAK, LISW

On April 13, 2011, Plaintiff underwent a community mental health assessment and was described as difficult to assess.  According to Ms. Budak, Plaintiff seemed to be in a daze, was slow to respond to questions, and wanted the session to end early.  Ms. Budak's notes reflect that a significant amount of the information provided during the interview was provided by Plaintiff's sister.  During the interview, Plaintiff complained that his Zyprexa medication made him sleepy, that he experiences visual and auditory hallucinations through "Josh" who is imaginary and instructs Plaintiff to harm himself.  Plaintiff reported seeing shadows, that the radio talks to him, and that he closes his blinds because he worries others follow him and that people are outside.  Incidents of rage, bizarre behavior which frightened some family members and past psychiatric history were detailed by Plaintiff's sister.  Ms. Budak diagnosed Plaintiff with Psychosis not otherwise specified and assessed him a GAF score of 31-40 (Docket No. 12, pp. 274-278 of 494).

The record also contains a transfer of care document from Ms. Budak dated February 27, 2012, which reflects that on April 11, 2012, Plaintiff was going to be transferred to Dr. Marawaha.  Citing the severity of

10

Plaintiff's condition, the note provides that a clinical decision was made to continue treating Plaintiff in the PUC until he could be directly linked to a permanent provider.  Plaintiff's diagnosis was noted as Schizophrenia, and his GAF score 31-40 (Docket No. 12, p. 424 of 494).

4.  **MEDICAL SOURCE STATEMENT**

a.  **METROHEALTH SYSTEMS - DR. RAMAN MARWAHA, M.D.**

A Physician Questionnaire signed by Dr. Marwaha and dated August 1, 2012 reflects that Dr. Marwaha is a psychiatrist, and first treated Plaintiff on April 11, 2012, and then every four-to-eight weeks thereafter for approximately 30 minutes at a time.  Dr. Marwaha reported that Plaintiff has Schizophrenia, paranoid type with symptoms including paranoid ideations, auditory hallucinations and visual hallucinations.  Plaintiff was taking Zyprexa and initially started at a dosage level of 10 mg, which was increased to 20 mg during treatment.  Dr. Marwaha opined that due to Plaintiff's condition and limited insight and judgment that he is unable to sustain work five days a week for eight hours a day.  In response to the remaining questions, Dr. Marwaha noted Plaintiff's diagnoses and concluded that his symptoms would interfere with his abilities to maintain attention and concentration necessary to complete tasks, get along with co-workers and supervisors, make decisions, respond appropriately to work pressures, and for work in a competitive environment on a regular and sustained basis (Docket No. 12, pp. 458-459 of 494).

D.  **CONSULTATIVE EXAMINATIONS & AGENCY FINDINGS**

1.  **CONSULTATIVE EXAMINATION - DR. J. JOSEPH KONIECZNY, PH.D., PSYCHOLOGIST**

On April 8, 2011, Plaintiff underwent a consultative psychological examination with Dr. Konieczny at the request of the State agency (Docket No. 12, p. 259 of 494).  During his clinical interview Dr. Konieczny described Plaintiff as apprehensive, appearing suspicious, guarded, and that he was a "very poor historian."  Dr. Konieczny noted that Plaintiff's sister provided much of the information concerning Plaintiff's background information and history.  Dr. Konieczny determined that Plaintiff suffers from Schizo Affective Disorder,

11

Depressive type, Antisocial Personality Disorder, and he indicated that consideration should be given to a diagnosis of Borderline Intellectual Functioning, and Cannabis Abuse or Dependence. Furthermore, Dr. Konieczny found Plaintiff's abilities to concentrate, withstand stress and pressure, and relate to others and deal with the general public, indicative of marked impairment, but assessed Plaintiff's ability to follow directions only moderately limited (Docket No. 12, p. 262 of 494). Plaintiff's insight into his current situation was assessed as poor and it was noted that he shows marked deficits in his awareness of rules of social judgment and conformity, and in his overall level of judgment. Noting that Plaintiff resided with his sister, and he does not participate in any routine daily household responsibilities, Dr. Konieczny opined that Plaintiff requires a significant degree of supervision and monitoring to manage his daily activities and assessed Plaintiff a GAF of 38 (Docket No. 12, p. 262 of 494).

### 2. STATE AGENCY MEDICAL FINDINGS

For Plaintiff's initial disability determination, his Psychiatric Review Technique (PRT) and Mental RFC assessments were attempted by Dr. Melanie Bergsten, Ph.D., on October 8, 2010 (Docket No. 12, p. 65 of 494). According to Dr. Bergsten, Plaintiff's medical evidence included records referencing a history of PTSD, Polysubstance Abuse and Antisocial Personality Disorder, but that there was insufficient evidence to establish the severity of listings 12.06 for Anxiety-Related Disorders and 12.09 for Substance Addiction Disorders or to otherwise render a mental RFC assessment (Docket No. 12, pp. 64-65 of 494).

Upon reconsideration, Plaintiff's PRT and mental RFC were evaluated by Dr. David Dietz, Ph.D., on June 1, 2011 (Docket No. 12, p. 74 of 494). Dr. Dietz's findings note that there was insufficient evidence to assess the 'A' criteria of listings 12.06 for Anxiety-Related Disorders and 12.09 for Substance Addiction Disorders (Docket No. 12, p. 74 of 494). Dr. Dietz did find sufficient evidence to render an opinion for the 'B' criteria under listing 12.06 for Anxiety-Related Disorders, opining Plaintiff had mild restrictions of activities of daily living and in maintaining concentration, persistence or pace, moderate difficulties maintaining social

functioning, and no evidence of repeated episodes of decompensation of extended duration (Docket No. 12, p. 74 of 494). According to Dr. Dietz's mental RFC findings, Plaintiff has moderate limitations in interacting appropriately with the general public, accepting instructions and appropriately responding to criticism from supervisors, but Dr. Dietz noted that Plaintiff retains the capability to perform tasks which do not involve more than superficial social interactions (Docket No. 12, p. 76 of 494). Plaintiff was also assessed as having a moderate limitation in responding appropriately to changes in the work setting, but Dr. Dietz opined Plaintiff would be capable of functioning in an environment with flexible production standards and schedules (Docket No. 12, p. 76 of 494). The explanation accompanying Dr. Dietz's findings noted numerous inconsistencies in Plaintiff's medical file as the basis of his findings (Docket No. 12, p. 76 of 494).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014)*.* In making this determination, the regulations require the

Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b),  416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  While the claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

### IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Prinsloo made the following findings:

1.    Plaintiff has not engaged in substantial gainful activity since July 30, 2010, the applications date.

14

2.      Plaintiff has the following severe impairment: mood disorder.

3.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the ALJ found that the Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff is limited to performing simple, routine, repetitive tasks, requiring no more than superficial interaction with the public.

5.      Plaintiff has no past relevant work.

6.      Plaintiff was born on February 6, 1968 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      Plaintiff has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

9.      Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.     Plaintiff has not been under a disability, as defined in the Act since July 30, 2010, the date the application was filed.

(Docket No. 12, pp. 15-31 of 494).

## V. Standard of Review

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's

findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and argues that the ALJ erred by failing to: (1) comply with the regulatory requirements for evaluating medical opinions; (2) give "good reasons" for discounting the opinions of treating psychiatrist, Dr. Marwaha; (3) weigh the requisite 20 C.F.R. § 416.927(c) factors in determining to afford "little weight" to  Dr. Konieczy's opinions; and (4) credit the opinions of evaluating sources over the State agency's nonexamining sources (Docket No. 15).

### B.    DEFENDANT'S RESPONSE

Defendant maintains that the ALJ's decision is supported by substantial evidence and contends that (1) Dr. Marwaha's opinion is not that of a "treating source," is conclusory, and unsupported; (2) the ALJ's decision to afford Dr. Konieczy's opinions "little weight" is supported by substantial evidence since they were based on inaccurate and inconsistent evidence; and (3) the ALJ's reliance on the opinions of the State agency's reviewing psychologists' opinions over Dr. Marwaha's and Dr. Konieczy's opinions is supported by substantial evidence

16

because the State agency's findings are consistent with the record (Docket No. 17).

**C.    ANALYSIS**

 **1.    CLASSIFICATION OF DR. MARWAHA'S OPINIONS**

  Plaintiff argues that Dr. Marwaha's opinion is that of a "treating source" and entitled to controlling weight.   Since Dr. Marwaha's opinion was discounted in the ALJ's analysis, Plaintiff contends that the ALJ erred in failing to provide good reasons for determining not to afford the opinion controlling weight (Docket No. 15, pp. 10-13 of 14).   Defendant disputes that Dr. Marwaha is a "treating source," and maintains that the ALJ was under no obligation to provide good reasons, but nevertheless did so in his decision (Docket No. 17, pp. 10-15 of 20).

  **a.    THE TREATING PHYSICIAN RULE**

  Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record.   The treating physician rule is one such standard and requires that a treating source's opinion be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 548 (6th Cir. 2004)); *Blakley*, 581 F.3d at 406; *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996). The regulations define a treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 416.902 (West 2014).   The physician, psychologist, or other acceptable medical source must treat the claimant "'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)(quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).   The treating physician rule stems from the belief that a claimant's treating physicians are best

17

positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

Where a treating physician's opinion is not given controlling weight, there remains a rebuttable presumption that such opinion is entitled great deference. *Rogers*, 486 F.3d at 242 (citation omitted).  To reject a treating physician's opinions an ALJ must provide "good reason" for doing so in their decision to make it sufficiently clear to "subsequent reviews the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted).  To comply with the obligation to provide good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson,* 378 F. 3d at 546). Those factors require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion (supportability), the consistency of the opinion with the record as a whole, the specialization of the opinion, and any other factors which tend to support or contradict the opinion.  20 C.F.R. § 416.927(c) (West 2014).

For medical opinions rendered by sources that cannot be classified as "treating sources," the regulations provide a framework for evaluating such opinions.  *See* 20 C.F.R. § 416.927(c) (West 2014). "As a general

matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source") . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013)(citation omitted).  The regulations require that the ALJ consider the § 416.927(c) factors for all medical opinions that are not entitled to controlling weight.

> **b.**     **DR. MARWAHA IS NOT A "TREATING SOURCE"**

Dr. Marwaha's treatment records for Plaintiff reflect that he first treated Plaintiff in April 2012 and again in May and July 2012, before completing a Physician Questionnaire on August 1, 2012 (Docket No. 12, pp. 426; 472; 479; 458-459 of 494).  Courts in the Sixth Circuit have determined that three treatment sessions are insufficient to qualify a medical provider as a "treating source"  *See Cruse*, 502 F.3d at 540 (holding the ALJ did not err in deciding not to afford controlling weight to a medical source who had examined claimant three times); *Beauchamp v. Comm'r of Soc. Sec.*, 2014 WL 1154117, at *10 (N.D. Ohio 2014)(finding medical source was not a treating source because he first rendered a function capacity opinion after seeing claimant only once and second capacity evaluation after seeing claimant three times).  Therefore, Dr. Marwaha's opinion cannot be classified as that of a "treating source" and is not entitled to controlling weight pursuant to the treating physician rule.  Instead, Dr. Marwaha's opinion is that of a "nontreating source," which requires only that the Commissioner consider the § 416.927(c) factors in determining the weight to afford the opinion. *See* 20 C.F.R. §§ 416.902, 416.927(c) (West 2014).

ALJ Prinsloo's decision reflects that he classified his consideration of the requisite factors.  The ALJ references Dr. Marwaha's specialization as a Psychiatrist, details Plaintiff's treatment history with Dr. Marwaha, and summarizes Dr. Marwaha's findings before noting that he afforded the findings "little weight" on account that they were poorly explained, confusing, and failed to address the effects of Plaintiff's substance abuse and

medication on his condition (Docket No. 12, pp. 25-26; 28 of 494). Since Dr. Marwaha is not a treating physician, the ALJ was not required to set forth "good reasons" as required in the context of an analysis discounting a "treating source" opinion. As a result, the regulations only require the ALJ make the record sufficiently clear that he considered the requisite § 416.927(c) factors in making his determination concerning the weight to afford the opinion.

### c. WHETHER THE ALJ'S DECISION TO AFFORD DR. MARWAHA'S OPINIONS "LITTLE WEIGHT" IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff implicitly argues that Dr. Marwaha's opinions should have been given controlling weight since they are not inconsistent with the other substantial evidence of the record. Plaintiff also challenges the ALJ's findings concerning Dr. Marwaha's failure to consider the evidence of his substance abuse, which he contends is inconsistent with negative toxicology screening results (Docket No. 15, pp. 12-13 of 14). Defendant contends that the ALJ's decision to discount Dr. Marwaha's opinion is supported by substantial evidence because the opinions rendered in Dr. Marwaha's Physician Questionnaire lack any supporting explanations for the clinical techniques he relied upon in reaching his conclusions (Docket No. 17, p. 12 of 20). By offering the "same unenlightening conclusion" and referring to "incomplete treatment notes," Defendant argues that Dr. Marwaha failed to provide any useful information concerning Plaintiff's impairments or the effects of his diagnosis (Docket No. 17, p. 12 of 20). With respect to Plaintiff's substance abuse and the effect of his medications, Defendant contends that the record is replete with indications of his substance abuse and contains evidence that his condition had improved with treatment (Docket No. 17, pp. 13-15 of 20). Defendant's contentions are well-taken.

In questions six through ten of Dr. Marwaha's Physician Questionnaire, he was asked to comment on the affect of Plaintiff's symptoms and impairments on specific functional abilities for work activity (Docket No. 12, pp. 458-459 of 494). Dr. Marwaha's responses to those five questions are essentially the same, detailing

20

Plaintiff's diagnoses followed by a conclusion that Plaintiff is unable to perform the specific activity identified in the question (Docket No. 12, pp. 458-459 of 494).   Without more, it is unclear exactly how Plaintiff's diagnosis led Dr. Marwaha to his conclusion that Plaintiff is unable to perform the identified activity.   In response to question ten, Dr. Marwaha also cited his treatment notes, but those records also lack an opinion or explanation concerning Plaintiff's abilities to perform any of the activities identified in questions six through ten (Docket No. 12, pp. 458-459; 429-430; 472-473; 479-480 of 494).  The findings contained in Dr. Marwaha's Physician Questionnaire also lack any indication that he considered Plaintiff's improvements during treatment. During a follow-up examination with Dr. Marwaha in July 2012, Plaintiff reported a reduction in the intensity of his auditory hallucinations, denied experiencing visual hallucinations for weeks and Dr. Marwaha opined that he had stabilized and was at baseline with medication (Docket No. 12, pp. 479-480 of 494).

While Dr. Marwaha's mental status examinations, diagnoses and treatment plans for Plaintiff are consistent with findings rendered by other medical sources who also treated Plaintiff, there is no indication that ALJ Prinsloo discounted such evidence as those findings are referenced elsewhere in the ALJ's decision (Docket No. 12, pp. 21-26 of 494).  Instead, the ALJ's decision reflects that he discounted Dr. Marwaha's findings contained in his Physician Questionnaire.  Of the medical sources who provided treatment to Plaintiff, only Dr. Marwaha provided any opinion concerning Plaintiff's capabilities for work activity.  Unfortunately, however, Dr. Marwaha's explanations include no insight as to the effects of his impairments and symptoms on his functional capacity.

For these reasons, the undersigned Magistrate finds the ALJ's decision to afford Dr. Marwaha's opinions "little weight" is supported by substantial evidence.

## 2.    WHETHER THE ALJ PROPERLY EVALUATED DR. KONIECZNY'S MEDICAL OPINION

Plaintiff also challenges the ALJ's decision to afford Dr. Konieczny's consultative medical opinion "little weight" in his analysis and alleges that the ALJ failed to properly consider the requisite 20 C.F.R. § 416.927(c)

factors (Docket No. 15, p. 13 of 14).  Plaintiff maintains that proper consideration of these factors supports giving Dr. Konieczny's opinions considerable weight, noting that he is a psychologist and by regulation, his opinions highly qualified in the area of disability evaluations (Docket No. 15, p. 13 of 14).  Defendant argues that the ALJ properly discounted Dr. Konieczny's opinions on the basis that he relied on inaccurate information about Plaintiff's living with his sister and reliance upon her for activities of daily living (Docket No. 17, pp. 15-16 of 20).  Furthermore, Defendant contends that Dr. Konieczny lacked the benefit of reviewing later treatment records showing Plaintiff's condition had improved with medication (Docket No. 17, pp. 15-16 of 20).

An opinion rendered by a consultative examiner is also a "nontreating source opinion," which as noted in the preceding section, only requires that the ALJ consider the § 416.927(c) factors in evaluating the weight to assess the opinion.  There is no requirement that an ALJ engage in an exhaustive factor-by-factor analysis in order to have properly considered the requisite § 416.927(c) factors. *See e.g. Kutscher v. Comm'r of Soc. Sec.*, 2014 WL 3895220, at *9 (N.D. Ohio 2014)(quoting *Francis v. Comm'r of Soc. Sec.*, 414 F.App'x 802, 804 (6th Cir. 2011)(noting that even in the context of an analysis discounting a treating source's opinion, an exhaustive factor-by-factor analysis is not required)). The ALJ's decision reflects his consideration of the requisite factors, referencing Plaintiff's treating relationship with Dr. Konieczny as a consultative examination, and Dr. Konieczny's specialization as a psychologist, before detailing his rationale for discounting the opinion (Docket No. 12, p. 29 of 494).

In providing his rationale for discounting Dr. Konieczny's findings, ALJ Prinsloo first observed that Dr. Konieczny's conclusion that Plaintiff appeared to require a significant degree of supervision in his daily activities was premised on Dr. Konieczny's belief that Plaintiff was completely reliant on his sister for routine daily household responsibilities (Docket No. 12, p. 29 of 494).  ALJ Prinsloo explained that the evidence that Plaintiff had stopped living with his sister, moved in with a friend, and then into his own apartment suggested a greater level of independence than Dr. Konieczny opined (Docket No. 12, p. 29 of 494).  The evidence supports

22

the ALJ's findings.  In a medical record from April 2012, Plaintiff reported living with his friends (Docket No. 12, p. 426 of 494).  One month later, a medical record from May 2012, notes that Plaintiff had complained about his living  situation, explaining that his sister and mother were soon going to be unable to pay for his apartment, which was again referenced in Plaintiff's most recent treatment record from July 2012 (Docket No. 12, pp. 472; 479 of 494).

Another reason provided by ALJ Prinsloo in support of discounting Dr. Konieczny's findings observed that at the time of Dr. Konieczny's consultative examination, Plaintiff had only recently undergone a mental evaluation and started regular mental health treatment (Docket No. 12, pp. 29; 479-480 of 494).  Following Plaintiff's release from prison in the summer of 2010, the record reflects that he first presented himself for treatment related to mental health symptoms in late March of 2011 (Docket No. 12, pp.  228-234; 285-292 of 494).  On April 9, 2011, Plaintiff underwent his consultative examination with Dr. Konieczny (Docket No. 12, p. 259 of 494).  Plaintiff began regular mental health treatment following a mental health assessment on April 13, 2011 (Docket No. 12, p. 274 of 494).  By virtue of the date of Dr. Konieczny's findings he was unable to consider later dated treatment records in 2012, which indicated Plaintiff had stabilized with medication (Docket No. 12, pp. 479-480 of 494).

Finally, ALJ Prinsloo indicated discounting Dr. Konieczny's opinion on the basis that he failed to fully address Plaintiff's presentation as a "poor historian" citing Plaintiff's failure to present accurate information about his family and legal history (Docket No. 12, p. 29 of 494).  The undersigned Magistrate notes that among Dr. Koneczny's findings, he reported that Plaintiff was a "very poor historian," and indicated that Plaintiff's sister helped to provide much of his background information and history during the clinical interview (Docket No. 12, p. 259 of 494).  Plaintiff's unwillingness to cooperate is well documented throughout the record in his evaluations with treatment providers (Docket No. 12, pp. 245; 250; 252; 274; 418 of 494).  While Dr. Koneczny's findings reference the reliability of information provided and the need for further information to

23

confirm whether additional diagnoses are appropriate, Dr. Koneczny does not expressly address Plaintiff's presentation as a "poor historian" in reporting his family and legal history (Docket No. 12, p. 262 of 494).

For these reasons, the undersigned Magistrate finds the ALJ's decision to afford Dr. Koneczny's opinion "little weight" is supported by substantial evidence.

### 3. WHETHER THE ALJ'S DECISION TO AFFORD "GREAT WEIGHT" TO THE STATE AGENCY'S MEDICAL AND PSYCHOLOGICAL CONSULTANTS' OPINIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

As part of his contention that the ALJ erred in evaluating the medical opinions, Plaintiff argues that the record does not support crediting the State agency's medical and psychological findings over the evaluating opinions of Dr. Marwaha and Dr. Konieczny (Docket No. 12, pp. 11-13 of 14).  Plaintiff supports his claim by contending: (1) that neither Dr. Bergsten or Dr. Dietz had the benefit of reviewing almost two years worth of subsequent treatment records; (2) that Dr. Bergsten found insufficient evidence even to render her opinion concerning his limitations; and (3) that Dr. Dietz's reference to malingering in the record is unsupported by a diagnosis from an "acceptable medical source" (Docket No. 15, p. 11 of 14).  Defendant disputes Plaintiff claims and asserts the ALJ's credibility determination is consistent with the record (Docket No. 17, pp. 16-17 of 20).  Moreover, Defendant cites unreported Sixth Circuit case law to argue that an ALJ may rely on reviewing opinions from State agency medical or psychological sources, even where their assessment lacks the benefit of the entire medical record, so long as the ALJ considers the subsequently dated records (Docket No. 17, pp. 17-20 of 20).

Plaintiff accurately notes that Dr. Bergsten was unable to render either PRT or a mental RFC assessment due to insufficient evidence, but misconstrues the significance of her findings, which ultimately supports the ALJ's conclusion that Plaintiff has a RFC for a full range of all work at all exertional levels without any limitations.   It is the claimant, not the agency, who bears the burden of proving that he has a disabling impairment, which precludes him from performing his past relevant work. *See Her*, 203 F.3d at 391("we note

24

that the burden of proof lies with the claimant at steps one through four of the process, culminating with a claimant's proof that she cannot perform her past relevant work"). Since Plaintiff failed to present sufficient evidence to render the requisite assessments, Dr. Bergsten's findings support ALJ Prinsloo's decision.

With respect to Plaintiff's second argument concerning the age of the State agency's assessments and the record that was before them, Plaintiff's argument is unpersuasive. While an ALJ is not bound by findings made by the State agency's medical or psychological sources, the regulations require that the ALJ consider such findings. *See* 20 C.F.R. § 416.927(e)(2) (West 2014). This requirement exists because the State agency's medical and psychological sources are "highly qualified specialists" and "experts" in evaluating disability claims. *Id.* It is therefore, of no surprise that the agency's rules provide that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists . . . may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6P, 1996 WL 374180, at *3 (West 2014). Contrary to Plaintiff's suggestion, neither the age of the State agency's medical or psychological source assessments, nor the age of record on which they are based, are disqualifying factors in and of themselves. "There is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record." *Allen-McGuire v. Comm'r of Soc. Sec.*, 2014 WL 2612020 at *13 (N.D. Ohio 2014)(quoting *Helm v. Comm'r of Soc. Sec.*, 405 F.App'x 997, 1002 (6th Cir. 2011)(internal quotation marks omitted)). Where the State agency opinion credited by an ALJ is aged, precedent in this district suggests only that the record bare some indication that the ALJ considered the effect of subsequent medical records on the State agency's assessments. *See Allen-McGuire*, 2014 WL 2612020, at *13 (citing *Blakley*, 581 F.3d at 409). After having reviewed the evidence in this case, the undersigned Magistrate finds that the ALJ has complied with the requirement.

ALJ Prinsloo's decision contains a multiple page summary of the evidence, which includes the records dated after the State agency's medical and psychological assessments (Docket No. 12, pp. 20-28 of 494). By

virtue of the fact that the ALJ's decision assesses RFC limitations limiting Plaintiff to simple, routine, and repetitive tasks, none of which were specifically recommended by the State agency's medical or psychological sources, the ALJ has clearly indicated his consideration of the effects of the most recently dated records on the State agency's assessments.

Finally, Plaintiff argues that it should be "pointed out" that Dr. Dietz's reference to malingering only appears once and was provided by a source, who is not an "acceptable medical source" capable of rendering a diagnosis under the Act.  The undersigned Magistrate finds Plaintiff's contention well-taken.  Only "acceptable medical sources" may offer medical opinions. 20 C.F.R. § 416.927(a)(2) (West 2014).  Medical opinions include statements from "acceptable medical sources" that reflect judgments about the nature and severity of your impairment including a diagnosis. *Id.*  A professional counselor is not an "acceptable medical source."  Therefore, any reliance by Dr. Dietz on the counselor's diagnosis of malingering was inappropriate, however; it was not the only evidence cited by Dr. Dietz to support his findings and the Court finds Dr. Dietz's findings otherwise supported by substantial evidence.

For the foregoing reasons, the ALJ's reliance on the State agency's medical and psychological opinions over those rendered by Dr. Marwaha and Dr. Konieczny is supported by substantial evidence.

## VII. CONCLUSION

For the reasons set forth above, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   September 9, 2014

26